[Cite as *State v. Dean*, 2022-Ohio-3105.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

MADISON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NOS. CA2021-08-013<br>CA2021-08-014 |
| | : | |
| - vs - | : | O P I N I O N<br>9/6/2022 |
| | : | |
| SAMUEL J. DEAN, et al., | : | |
| Appellants. | : | |

CRIMINAL APPEAL FROM MADISON COUNTY MUNICIPAL COURT
Case Nos. CRB2100235A, CRB2100235B, CRB2100236A, CRB2100236B

Nicholas A. Adkins, Madison County Prosecuting Attorney, and Rickelle A. Davis, Assistant Prosecuting Attorney, for appellee.

The Helbling Law Firm, LLC, and John J. Helbling, for appellants.

**S. POWELL, J.**

{¶ 1} Appellants, Samuel J. Dean and his wife, Julie A. Dean, appeal from their convictions in the Madison County Municipal Court after a jury found them both guilty of third-degree misdemeanor criminal mischief and fourth-degree misdemeanor criminal trespass. For the reasons outlined below, we affirm the Deans' convictions for criminal mischief in Case Nos. CRB2100235A and CRB2100236A. We also affirm Mrs. Dean's

conviction for criminal trespass in Case No. CRB2100235B.  However, finding Mr. Dean's conviction for criminal trespass was not supported by sufficient evidence, we reverse and vacate Mr. Dean's criminal trespass conviction in Case No. CRB2100236B.

**Facts and Procedural History**

{¶ 2}   On March 20, 2021, the Deans were served with summons and complaints charging them with single counts of third-degree misdemeanor criminal mischief in violation of R.C. 2909.07(A)(1)(a) and fourth-degree misdemeanor criminal trespass in violation of R.C. 2911.21(A)(2).  The charges related to Mr. Dean were given Case Nos. CRB2100236A and CRB2100236B, whereas the charges related to Mrs. Dean were given Case Nos. CRB2100235A and CRB2100235B.  As set forth within those complaints, the charges arose after the Deans were seen on security camera footage entering onto the Plain City Public Library's property located at 305 West Main Street, Plain City, Madison County, Ohio afterhours at approximately 6:00 p.m. on Sunday, March 14, 2021.  The complaints allege that once the Deans were on the library's property that the Deans placed "propaganda stickers" on the library's curbside pick-up box and traffic sign located on the library's back parking lot.

{¶ 3}   The record contains photographs of both stickers found stuck to the curbside pick-up box and traffic sign.  Those stickers appeared as follows:




{¶ 4}   On March 31, 2021, the Deans were arraigned and entered pleas of not guilty

to all charges. The Deans were then appointed with their own separate counsel. The Deans, however, later dismissed their attorneys and instead proceeded pro se at all times relevant to this appeal.

{¶ 5} Shortly after Mr. and Mrs. Dean entered their not guilty pleas, they filed identical motions with the trial court requesting the court grant them "meaningful access" to the "public law library" that "must not be pursuant to unlawfully restraint – to undertake a medical intervention without any informed consent and without any medical necessity or consultation with a qualified physician who is licensed and insured to practice medicine." Several days later, on April 2, 2021, the trial court issued separate entries in both Mr. Dean's and Mrs. Dean's cases notifying the Deans that their motions were "impossible to comprehend." Because of this, the trial court requested the Deans "clarify with counsel and refile" their motions with the court. The Deans, however, never refiled any similar motion with the trial court with the assistance of counsel or otherwise.

{¶ 6} On April 28, 2021, the Deans filed two notices with the trial court requesting they be provided with reasonable accommodations in accordance with Title II of the Americans with Disabilities Act ("ADA"). That same day, as well as in the weeks and months that followed, the Deans filed numerous other motions, "notices," and "entries" with the trial court. This included the Deans filing separate, albeit similarly worded, motions seeking to withdraw their earlier not guilty pleas. The Deans also filed demands for discovery, several motions to compel, motions to subpoena the judge presiding over their cases, as well as a variety of motions to dismiss. This included motions to dismiss due to a "lack of evidence," the state's alleged "failure to make discovery" and "withholding evidence," and on speedy trial grounds. This also included the Deans each filing another notice with the trial court requesting the court provide them with reasonable ADA accommodations.

{¶ 7} On May 20, 2021, the trial court issued separate entries addressing the Deans' initial requests for reasonable ADA accommodations. In both entries, the trial court noted that the Deans had been either "unable or unwilling" to disclose what type of accommodation they were asking the court to provide to them.[1] The trial court also noted that it had attempted to "decipher if a need was present" by asking the Deans what they had been diagnosed with and/or what type of physician had they had been diagnosed by. To this, the trial court noted that "Mr. Dean informed the Court that he was not going to disclose the nature of his disability." As for Mrs. Dean, the trial court noted that "Mrs. Dean informed the Court that she was self-diagnosed but could not or would not indicate what the diagnosis was for." Given the Deans' refusal to cooperate with the trial court by answering even the most basic of questions regarding their purported disabilities, the trial court concluded both entries by noting that, without more information from the Deans, the court was "unable to provide any assistance" to them.

{¶ 8} On July 13, 2021, the trial court held a joint hearing to address all of the Deans' still pending motions. This included Mr. and Mrs. Dean's additional notices they had filed with the trial court requesting the court provide them with reasonable ADA accommodations. The trial court did this after having previously issued an entry on May 20, 2021 that consolidated the Deans' cases for purposes of this pretrial hearing and for purposes of trial.

{¶ 9} At the start of this hearing, Mr. Dean stood and began reading from a prepared statement requesting the trial court dismiss the charges against him because "[his] ADA rights, [his] access to this court, have been prejudiced, compromised, and denied

---

1. This unwillingness ultimately resulted in the trial court finding Mr. Dean in contempt and fining him $250 when Mr. Dean continued to read from his prepared statement despite the trial court judge telling him to stop reading, to stop interrupting, and to stop speaking over the judge.

irreparably." To this, the trial court informed Mr. Dean that they were "not here for that," but were instead "here to see what accommodation it is that you're asking for" given his repeated refusal to provide this information to the court when asked. The trial court also noted that, "[a]t all previous occasions," Mr. Dean had "refused" to tell the court what type of reasonable ADA accommodation that he was seeking. The trial court then advised Mr. Dean that "[t]he Court can't help you if you don't tell me what it is that you want." However, rather than simply telling the trial court what it was that he was requesting, Mr. Dean instead responded by reading his prepared statement again.

{¶ 10} Upon hearing Mr. Dean's prepared statement for a second time, the trial court advised Mr. Dean, "[t]hat does nothing for me." The trial court then set the matter for trial to take place on the morning of July 29, 2021. The trial court then called Mrs. Dean's case to order. Shortly after Mrs. Dean's case was called, Mrs. Dean stood and began reading from the same prepared statement that Mr. Dean had just moments before recited to the trial court as part of his case. The record indicates Mrs. Dean then told the trial court judge that he had "been served." The judge responded, "Well, I haven't," and set the matter for trial to also take place on the morning of July 29, 2021.

{¶ 11} On July 19, 2021, ten days before their trial was scheduled to begin, the Deans each filed affidavits with the Ohio Supreme Court seeking to disqualify the trial court judge from presiding over their respective cases because they had filed a federal lawsuit and grievance against the judge. The Ohio Supreme Court denied Mr. Dean's request the next day upon finding no basis had been established to order the disqualification of the judge from presiding over his case.[2] *In re Disqualification of Schooley*, 165 Ohio St.3d

---

2. The record indicates that both Mr. Dean and Mrs. Dean filed affidavits with the Ohio Supreme Court seeking to disqualify the trial court judge from their respective cases. This court, however, was only able to locate the Ohio Supreme Court's decision as it relates to the affidavit of disqualification filed by Mr. Dean.

1221, 2021-Ohio-3568.

{¶ 12} On July 27, 2021, the trial court issued separate entries addressing the Deans' second request for reasonable ADA accommodations. The trial court's entries pertaining to Mr. and Mrs. Dean are nearly identical in substance and differ only in that they refer to the Deans individually, as well as make brief reference to the slightly different arguments that Mr. and Mrs. Dean had raised to the court. With those slight differences in mind, the trial court's entries state, in pertinent part, the following:

> [The Deans have] moved this Court for an accommodation claimed to fall under the umbrella of the American's With Disabilities Act. The first mention of any issue was at the May 3, 2021 pre-trial. [The Deans have] reiterated the motion continuously throughout the proceedings. However, [the Deans have] also refused to respond to any inquiry of the Court as to the nature of the disability, how it impacts [them], the precise accommodation sought, why it is needed or in fact provide any meaningful shred of information upon which the Court could provide assistance. The Court has bent over backwards in its attempts to ascertain the nature of the claimed disability. Obviously, the Court derives no benefit from denying a legitimate need for services and in fact routinely, even daily, provides a range of services to individuals appears before it.

{¶ 13} The trial court's entries continue and state:

> The Court has had the opportunity to observe [the Deans] in Court and review the massive filings prepared by and tendered by [the Deans], under [their] signature[s], during the pendency of this case. For purposes of this matter, [the Deans] would need to establish a disability that substantially inhibits the ability to see, hear, speak or otherwise communicate. To the contrary, [the Deans have] established a substantial body of work overwhelmingly showing a level of communication and comprehension that this Court rarely observes from defendants.

{¶ 14} The trial court's entries conclude by stating:

> While the Court has given [the Deans] repeated opportunities to support the Motion nothing of substance was provided. The Court has no information as to how the ADA would apply to [the Deans] let alone what actual accommodation is sought. Without getting over this initial hump, the Court does not even get to the

point where consideration of additional factors takes place which it would need to weigh prior to allowing any accommodation. The Court left the motion open until the last possible minute to maximize the opportunity of [the Deans] to prosecute the motion. That time has come to an end.

**{¶ 15}** On July 29, 2021, the trial court issued entries in both of the Deans' cases noting that it was overruling any and all motions, "notices," and "entries" that were still pending and had yet to be ruled on by the court. The trial court noted that this included the "documents and/or motions" the Deans had recently filed with the court within the preceding week. The matter then proceeded to trial. At the start of their trial, just prior to the jury pool being brought into the courtroom for the start of voir dire, the trial court addressed the Deans personally and advised the Deans of the following:

> Well, and I think as I've stated before, the court does not fall within the level of employees to have its own ADA coordinator. * * * With regard to any accommodation, the court's provided numerous hearings to allow you to explain what it is that you need. I understand you have issues with not wanting to do that. That's – but I can't do anything without knowing anything. And I've asked the questions, you won't answer them and that's where we are. So that's where we are here today is based on that.

**{¶ 16}** Once the jury was empaneled and opening statements from all parties complete, the state elicited testimony from four witnesses. Those four witnesses included two employees with the Plain City Public Library, Shane Hoffman and Christine Long, and two officers with the Plain City Police Department, Officer Joshua Hertzinger and Officer Aaron Howard. The Deans did not present any witnesses or introduce any testimony in their defense. The following is a summary of the relevant testimony and evidence presented at trial.

### Summary of Jury Trial Testimony and Evidence

**{¶ 17}** On Monday, January 25, 2021, Officer Aaron Howard was dispatched the

Plain City Public Library located at 305 West Main Street, Plain City, Madison County, Ohio to investigate an alleged trespassing in progress. Once there, Officer Howard came in contact with Mrs. Dean and other library staff who were all a "visibly upset" and arguing about Mrs. Dean refusing to leave the library for, among other reasons, her repeated refusal to wear a mask in violation of the library's mask policy then in effect.[3] After some coaxing, the record indicates Mrs. Dean did eventually leave the property. Upon Mrs. Dean's exit from the library, Officer Howard instructed Mrs. Dean that, per the library staff's request, she was "not to come to the property or she could be charged with criminal trespassing." Officer Howard also instructed Mrs. Dean that she was not to return to the library until she received "further notice from the library."

{¶ 18} Approximately two months later, on Sunday, March 14, 2021, Shane Hoffman, who is employed as the Plain City Public Library's technology service manager, took a break from work to eat his dinner outside in his car parked in the library's back parking lot. While there, Hoffman saw "a couple people," who Hoffman later identified as the Deans, "come around the edge of the building." Upon seeing this, Hoffman looked up and watched as the Deans "just sort of stopped for a second" and stood near the back corner of the library building. Hoffman then watched as Mrs. Dean "walked across in front" of his car and "then back across" in front of him as he remained seated in his car eating his dinner. When asked if he expected to see anybody at the library that day given that the library is closed on Sundays, Hoffman testified that he was caught off guard when he saw the Deans at the library because he was "under the impression that [Mrs. Dean] was not to be on the library property anymore."

---

3. The record indicates this was not the first time that Mrs. Dean had caused a scene at the library or been argumentative with library staff. The record instead indicates that Mrs. Dean's unruly behavior had been a continual issue for the library and its staff.

{¶ 19} Once Hoffman had finished eating, and seeing that the Deans were no longer on the library's property, Hoffman went back inside the library and sent an e-mail to his boss, Christine Long. In this e-mail, Hoffman notified Long that he had just seen the Deans on the library's property acting suspicious while walking around the library building. Upon receiving Hoffman's e-mail the next morning, Monday, March 15, 2021, Long, who is employed as the Plain City Public Library's director, reviewed the video footage of the incident captured by the library's security cameras to see "what might be going on" given "some prior interactions" and "prior incidents" that the library had with the Deans. Explaining what she saw on that video footage, Long testified that she initially saw the Deans enter onto library's property and approach the library's curbside pick-up box located next to the library's primary parking lot.

{¶ 20} Continuing, Long testified that she then saw the Deans kneel in front of the pick-up box "and it looked like they were doing something to the box." Long then testified:

> And at first it looked like they had left. They paused back at the front of the building and then walked up the sidewalk along the side of the building. And then in the video you can see them come around the building. It looked like Mr. Dean paused at one of the traffic signs at the back of the parking lot and placed something. Mrs. Dean walked down the sidewalk at the back side of the building and passed the back, went out of the camera view, turned around and then went back in the other direction.

{¶ 21} After reviewing the video footage taken from the library's security cameras, Long went outside to check the library's curbside pick-up box and traffic sign to "see what was going on." Long testified that she did this because, although it is impossible to see exactly what the Deans were doing to the pick-up box and traffic sign, "it did look suspicious." Once outside, Long discovered that a "bumper sticker" had been stuck inside the pick-up box next to a placard notifying library patrons not to leave materials in the box overnight. Long found another "bumper sticker" had been stuck to the back of the traffic

sign. Long then photographed and removed, or attempted to remove, the stickers that she found stuck to the pick-up box and traffic sign. The sticker that had been stuck to the pick-up box came off easily due to its slick, glossy painted surface. The sticker placed on the traffic sign, however, "would not come off" and is, in fact, "still there."

{¶ 22} Following Long's discovery of the two stickers, Long alerted the Plain City Police Department of what she had found. Long also notified the police that "we were sure who had put them there based on some staff members that had had prior interactions with" the Deans at the library. A subsequent police investigation conducted by Officer Joshua Hertzinger resulted in the Deans being charged with both criminal mischief and criminal trespass for their conduct of entering onto the library's property and defacing the library's property. The Deans were then served with the summons and complaint at their home by Officer Hertzinger. While being served, the record indicates Officer Hertzinger told both Mr. Dean and Mrs. Dean not to return to the library. Unlike Mrs. Dean who had already been told by Officer Howard not to be on the library's property, there is nothing in the record to indicate Mr. Dean was ever told by police or library staff that he could not be on the library's property prior to the charges being filed in this case.

**The Jury's Verdicts and the Deans' Sentences**

{¶ 23} Following closing arguments from all parties, and after deliberating for just over 20 minutes, the jury returned to the courtroom and issued its verdict finding the Deans guilty of both criminal mischief and criminal trespass offenses. Once the jury exited from the courtroom, the matter then proceeded to sentencing. For the criminal mischief charges, Deans both received 60 days in jail, with 58 of those days suspended, a $250 fine, 20 hours of community service, and one year of probation. For the criminal trespass charges, the Deans both received 30 days jail all suspended, no fine, and one year of probation.

**The Deans' Appeal**

{¶ 24} On August 13, 2021, the Deans filed notices of appeal from their respective convictions. This court sua sponte consolidated the Deans' appeals on August 30, 2021. Oral argument on the Deans' consolidated appeal took place before this court on June 6, 2022. The Deans' appeal now properly before this court for decision, the Deans have raised six assignments of error for this court's review.

**Assignment of Error No. 1:**

{¶ 25} THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANTS' PRE-TRIAL MOTION TO DISMISS ON SPEEDY TRIAL GROUNDS.

{¶ 26} In their first assignment of error, the Deans argue the trial court erred by denying their motions to dismiss on speedy trial grounds. We disagree.

{¶ 27} "Review of a speedy-trial claim involves a mixed question of law and fact." *State v. Long*, 163 Ohio St.3d 179, 2020-Ohio-5363, ¶ 15. When applying this mixed standard of review, this court must first defer to the trial court's factual findings if those findings are supported by competent, credible evidence. *State v. Watkins*, 12th Dist. Preble No. CA2020-03-005, 2021-Ohio-163, ¶ 37. Competent evidence is admissible evidence for the purpose of proving a relevant fact. *State v. Rodandello*, 12th Dist. Preble No. CA2022-01-001, 2022-Ohio-2460, ¶ 17, citing *Zimmerman v. Bowe*, 6th Dist. Lucas No. L-18-1200, 2019-Ohio-2656, ¶ 13 and *In re Meeks*, 11th Dist. Lake No. 95-L-050, 1995 Ohio App. LEXIS 4369, *13-14 (Sep. 29, 1995). "Credible evidence means evidence found worthy of being believed." *In re A.T.*, 12th Dist. Butler Nos. CA2018-06-115 and CA2018-06-116, 2018-Ohio-5295, ¶ 34. This court must then "independently review whether the trial court correctly applied the law to the facts of the case." *State v. Thacker*, 12th Dist. Warren No. CA2019-06-058, 2020-Ohio-1318, ¶ 28. A de novo standard of review therefore applies to

the trial court's application of the law to the facts. *State v. North*, 12th Dist. Butler No. CA2016-06-119, 2017-Ohio-492, ¶ 19. De novo means this court will afford no deference to the trial court's decision. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶ 28} "The right to a speedy trial is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Section 10, Ohio Constitution." *State v. Jones*, 12th Dist. Butler Nos. CA2019-01-006 and CA2019-01-008 2020-Ohio-2672, ¶ 17, citing *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶ 32. "To preserve this right, the Ohio General Assembly enacted the speedy trial statutes found in R.C. 2945.71 through 2945.73." *Id.*, citing *State v. Miller*, 12th Dist. Warren No CA2009-01-008, 2009-Ohio-4831, ¶ 8. Because the Deans were charged with third-and-fourth-degree misdemeanors, it is R.C. 2945.71(B)(1) that applies to this case. Pursuant to that statute, a person facing criminal charges for a third-or-fourth-degree misdemeanor must be brought to trial within 45 days after the person's arrest or the service of summons. The time limit set forth in R.C. 2945.71(B)(1) must be strictly enforced. *State v. Wood*, 5th Dist. Fairfield No. 2020 CA 00023, 2021-Ohio-2, ¶ 15. The language found in R.C. 2945.72, however, "provides a number of events and circumstances that will toll the running of a defendant's speedy-trial time." *State v. Martin*, 156 Ohio St.3d 503, 2019-Ohio-2010, ¶ 15, citing *State v. Ramey*, 132 Ohio St.3d 309, 2012-Ohio-2904, ¶ 24. This includes the events and circumstances set forth under R.C. 2945.72(E).

{¶ 29} R.C. 2945.72(E) provides that the time a defendant must be brought to trial may be extended by any delay necessitated by the defendant's own motion. *State v. Murphy*, 12th Dist. Clinton No. CA2006-02-005, 2007-Ohio-2068, ¶ 16. This includes, for example, a defendant's demand for discovery or a bill of particulars. *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, ¶ 26. This also includes such things as a defendant's

motion to reduce bond, a motion for disclosure of the identity of the confidential informant, or a motion to disclose grand jury proceedings. *State v. Nelson*, 12th Dist. Clinton No. CA2007-11-046, 2009-Ohio-555, ¶ 10. This is in addition to a defendant's motion to dismiss. *State v. Feasal*, 12th Dist. Fayette No. CA2005-12-034, 2006-Ohio-7039, ¶ 38. The state need not prove that a defendant's motion causes a delay in order for speedy-trial time to be tolled pursuant to R.C. 2945.72(E). *State v. Johnson*, 12th Dist. Butler No. CA2011-09-169, 2013-Ohio-856, ¶ 34. This is because "[i]t is the filing of the motion itself, the timing of which the defense can control, that provides the state with an extension." *State v. Sanchez*, 110 Ohio St.3d 274, 2006 Ohio 4478, ¶ 26. This law "implicitly recognizes that when a motion is filed by a defendant, there is a 'period of delay necessitated' – at the very least, for a reasonable time until the motion is responded to and ruled upon." *Id.*

{¶ 30} "A court reviewing a speedy trial issue must calculate the number of days attributable to either party and determine whether the defendant was brought to trial within the statutorily prescribed time limits." *State v. March*, 12th Dist. Butler No. CA2015-08-070, 2016-Ohio-3288, ¶ 10, citing *State v. Riley*, 162 Ohio App.3d 730, 2005-Ohio-4337, ¶ 19 (12th Dist.). This requires the computation of a "try-by-date." *State v. McCaleb*, 12th Dist. Warren No. CA2016-12-103, 2017-Ohio-6944, ¶ 9. As noted above, because the Deans were charged with third-and-fourth-degree misdemeanors in this case, R.C. 2945.71(B)(1) required the state to bring the Deans to trial within 45 days after their arrest or the service of summons. Both Deans were served with their respective summonses on March 20, 2021. "The actual date of service, however, does not count against the state for purposes of determining whether a defendant's right to a speedy trial has been violated." *State v. Espinoza-Soriano*, 6th Dist. Erie No. E-18-067, 2020-Ohio-139, ¶ 13, citing *State v. Kist*, 173 Ohio App.3d 158, 2007-Ohio-4773, ¶ 24 (11th Dist.). Therefore, because the actual

date of service does not count towards a speedy-trial calculation, this court must instead count 45 days from March 21, 2021, the day after the Deans were served with summons, to determine the Deans' try-by-date in this case.

{¶ 31} There are 45 days between March 21, 2021 and May 5, 2021, thus rendering May 5, 2021 as the Deans' try-by-date. The Deans were not tried until July 29, 2021. There are 85 days between May 5, 2021 and July 29, 2021. Therefore, rather than within 45 days after the service of their respective summonses as required by R.C. 2945.71(B)(1), the Deans were instead tried on the 130th day after service of their summonses was complete. Within those 130 days, however, the Deans filed a multitude of overlapping motions, "notices," and "entries" with the trial court. This included the Deans filing separate, albeit identical, motions seeking to withdraw their earlier not guilty pleas, demands for discovery, motions to compel, motions to subpoena the trial court judge presiding over respective their cases, and numerous motions to dismiss. This also included the Deans each filing two notices with the trial court requesting they be provided with ADA accommodations.

{¶ 32} Taking this all into account, this court has found just 22 days had lapsed without any applicable tolling related to Mr. Dean, whereas only 12 days had lapsed without any applicable tolling regarding Mrs. Dean. Therefore, although the Deans were not tried until the 130th day after the service of their respective summonses was complete, because the vast majority of those 130 days were tolled under R.C. 2945.72(E), the Deans were tried well within the necessary 45-day time limitation and their right to a speedy trial was not violated, either statutorily or constitutionally. Accordingly, because Mr. Dean and Mrs. Dean were both tried prior to the 45-day time limitation set forth in R.C. R.C. 2945.71(B)(1) expired, the trial court did not err by denying the Deans' motions to dismiss on speedy trial grounds. The Deans' first assignment of error lacks merit and is overruled.

**Assignment of Error No. 2:**

{¶ 33} THE COURT COMMITTED PLAIN ERROR IN DENYING DEFENDANTS-APPELLANTS REQUESTED ACCOMMODATIONS AND A COORDINATOR UNDER TITLE II OF THE ADA AND CFR.

{¶ 34} In their second assignment of error, the Deans argue the trial court committed plain error by denying their requests for reasonable ADA accommodations. The Deans also argue the trial court committed plain error by denying them access to an ADA coordinator to assist them at trial. However, as the record indicates, the Deans were provided with multiple opportunities to disclose to the trial court any accommodations that would assist them throughout the underlying proceedings. But, for reasons unknown, the Deans chose not to elaborate on their circumstances or to even identify their needs for the trial court to consider in the days, weeks, and months leading up to their trial. However, although the Deans refused to cooperate with the trial court by answering the most basic of questions regarding their purported disabilities, the trial court was nevertheless receptive to the specific requests made by the Deans during trial.

{¶ 35} For instance, when Mr. Dean requested the trial court judge speak slower, the judge responded positively and stated, "Sure. I'll slow down. No problem. Thank you." The same was true as it relates to Mrs. Dean's request that the trial court speak more loudly. The trial court also allowed the Deans with additional restroom breaks and permitted Mr. Dean, at his discretion, to stand up to stretch his legs during trial. The trial court judge, in fact, specifically stated that he did not "have any issues" and could not "think of why that would be a problem" for Mr. Dean to stand up during trial to stretch his legs so long as he "stay[ed] right there and just kind of stretch[ed] out." This is all to say that, despite the Deans' claims, the record indicates that each accommodation that the Deans specifically

requested of the trial court was granted by the trial court judge without any hesitation.

{¶ 36} In so holding, we note that the Deans were clearly prepared and capable of sufficiently representing themselves at trial without the need for an ADA coordinator being present to assist them. This is evidenced by the fact that the Deans were able to conduct, quite competently, voir dire of the jury pool, as well as present coherent, organized, and effective opening statements and closing arguments. The Deans were also able to cross-examine witnesses, introduce exhibits, and, for the most part, raise necessary and appropriate objections during the state's direct examination of its witnesses. We also note that there is nothing in the record to indicate the Deans were in any way hindered by the lack of any reasonable ADA accommodations that were not provided to them. The same is true as it relates to the absence of an ADA coordinator at trial. Far from it. The record instead indicates that the trial court went to great lengths to ensure that the Deans received a fair trial based upon evidence presented by the state.

{¶ 37} Therefore, although the Deans claim they were prejudiced by the lack of reasonable ADA accommodations, and by not having an ADA coordinator present to assist them at trial, we can find nothing in the record to indicate the Deans were subjected to a clear miscarriage of justice, nor have the Deans demonstrated plain error in this case. "An error does not rise to the level of a plain error unless, but for the error, the outcome of the trial would have been different." *State v. Cooperstein*, 12th Dist. Warren No. CA2018-09-117, 2019-Ohio-4724, ¶ 49. "The burden of demonstrating plain error is on the party asserting it." *State v. Davis*, 127 Ohio St.3d 268, 2010-Ohio-5706, ¶ 29. The Deans have fallen well short of satisfying that burden. Accordingly, finding no merit to the Deans' claims that the trial court committed plain error by denying their requests for reasonable ADA accommodations, or by denying them access to an ADA coordinator to assist them at trial,

the Deans' second assignment of error lacks merit and is overruled.

**Assignment of Error No. 3:**

{¶ 38} THE TRIAL COURT ERRED IN FAILING TO HOLD A HEARING ON DEFENDANTS-APPELLANTS SUBPOENA AND PLAINTIFF-APPELLEE'S MOTION TO QUASH SUBPOENA.

{¶ 39} In their third assignment of error, the Deans argue the trial court erred by granting the state's motion to quash their subpoena issued to the judge presiding over their cases. We disagree. We do so because the records the Deans were seeking to obtain from the judge, i.e., records concerning ADA accommodations and the existence of an ADA coordinator, had little, if any, probative value in this matter when considering the criminal charges they faced. There is also nothing in the record to suggest the information the Deans sought from the judge through subpoena could not be obtained from other sources. Because litigants may improperly attempt to disqualify a particular judge by subpoenaing the judge presiding over their case, the law strenuously guards against "judge shopping." That was, in essence, what the Deans were doing here.

{¶ 40} Under these circumstances, we must find the Deans' subpoena to be without merit. We also find the outcome of the Deans' trial would not have been different had the trial court conducted a more explicit hearing on the state's motion to quash, nor would it have made a difference if the trial court had focused its attention upon the state's motion when the Deans appeared before the trial court to discuss their other various, overlapping motions. Therefore, finding no merit to the Deans' claims that the trial court erred by granting the state's motion to quash their subpoena issued to the judge presiding over their cases, the Deans' third assignment of error lacks merit and is overruled.

**Assignment of Error No. 4:**

{¶ 41} THE TRIAL COURT JUDGE COMMITTED PLAIN ERROR IN FAILING TO RECUSE ITSELF DESPITE BEING NOTIFIED THAT DEFENDANT-APPELLANTS FILED A FEDERAL CIVIL LAWSUIT AGAINST HIM FOR VIOLATIONS OF TITLE II ADA.

{¶ 42} In their fourth assignment of error, the Deans argue the trial court judge erred by failing to recuse himself after they notified the judge that they had filed a federal lawsuit and grievance against him. However, as noted above, the Ohio Supreme Court reviewed Mr. Dean's request to have the trial court judge disqualified and found no basis had been established to order the disqualification of the trial court judge from presiding over his case. *In re Disqualification of Schooley*, 165 Ohio St.3d 1221, 2021-Ohio-3568. In so holding, the Ohio Supreme Court specifically stated that, "the mere fact that a federal lawsuit and grievance are pending against [the trial court judge] does not mean that he must be disqualified from Mr. Dean's criminal case." *Id.* at ¶ 4. Given the similarity of the cases, the same would certainly hold true for Mrs. Dean's case. Therefore, because the Ohio Supreme Court has already addressed this issue in overruling Mr. Deans' affidavit of disqualification upon finding no basis had been established to order the disqualification of the trial court judge from presiding over his case, the Deans fourth assignment of error lacks merit and is overruled.

**Assignment of Error No. 5:**

{¶ 43} THE JURY ERRED TO THE PREJUDICE OF DEFENDANTS-APPELLANTS BY FINDING THEM GUILTY OF THE CHARGES WITHOUT SUFFICIENT EVIDENCE.

{¶ 44} In their fifth assignment of error, the Deans argue the state presented insufficient evidence to support the jury's verdict finding them guilty of criminal trespass in

- 18 -

violation of R.C. 2911.21(A)(2).[4] For the following reasons, we disagree as it relates to Mrs. Dean's criminal trespass conviction, but agree as it relates to Mr. Dean's criminal trespass conviction. Therefore, while we affirm Mrs. Dean's criminal trespass conviction in Case No. CRB2100235B, Mr. Dean's criminal trespass conviction in Case No. CRB2100236B is reversed and vacated.

*Sufficient Evidence Standard*

{¶ 45} "A claim challenging the sufficiency of the evidence invokes a due process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 165, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). "When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Intihar*, 12th Dist. Warren No. CA2015-05-046, 2015-Ohio-5507, ¶ 9. "The relevant inquiry is 'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Roper*, 12th Dist. Clermont No. CA2021-05-019, 2022-Ohio-244, ¶ 39, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. This test "requires a determination as to whether the state has met its burden of production at trial." *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34.

---

4. The Deans did not challenge their convictions for criminal mischief as part of their appeal. By not appealing their criminal mischief convictions, the Deans have effectively conceded that there was sufficient evidence to support their convictions for criminal mischief in violation of R.C. 2909.07(A)(1)(a). The trial court's two judgments convicting the Deans of criminal mischief in Case Nos. CRB2100235A and CRB2100236A are therefore affirmed.

*Criminal Trespass in Violation of R.C. 2911.21(A)(2)*

**{¶ 46}** The Deans were convicted of criminal trespass in violation of R.C. 2911.21(A)(2). Pursuant to that statute, a criminal trespass occurs when one, "without privilege to do so," knowingly enters or remains on the land or premises of another, "the use of which is lawfully restricted to certain persons, purposes, modes, or hours, when the offender knows the offender is in violation of any such restriction or is reckless in that regard." "[T]his subsection covers situations where the land or premises involved are subject to rules on access or use, and the offender knows or has reasonable cause to believe he is in violation of such rules." *State v. McMechan*, 48 Ohio App.3d 261, 262 (12th Dist.1988); *State v. Kilgore*, 2d Dist. Montgomery No. 17880, 2000 Ohio App. LEXIS 2612, *7 (June 16, 2000).

**{¶ 47}** "Privilege is the distinguishing characteristic between unlawful trespass and lawful presence on the land or premises of another." *State v. Roland*, 12th Dist. Butler No. CA2012-05-104, 2013-Ohio-1382, ¶ 17. R.C. 2901.01(A)(12) defines the term "privilege" to mean "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." "'Where no privilege exists, entry constitutes trespass.'" *State v. Hardcastle*, 12th Dist. Butler No. CA2020-04-053, 2020-Ohio-5396, ¶ 13, quoting *State v. Lyons*, 18 Ohio St.3d 204, 206 (1985). "It is generally recognized that 'a person has a privilege to enter and be upon the public areas of public property.'" *In re B.J.M.*, 11th Dist. Lake No. 2017-L-007, 2017-Ohio-8202, ¶ 20, quoting *Cleveland v. Dickerson*, 8th Dist. Cuyahoga Nos. 101782 and 101783, 2016-Ohio-806, ¶ 21.

**{¶ 48}** The General Assembly, however, has made it clear that "a trespass is not excused simply because the property involved is publicly owned." *State v. Staley*, 1st Dist.

Hamilton Nos. C-200270 thru C-200272, 2021-Ohio-3086, ¶ 12, citing R.C. 2911.21(B) ("It is no defense to a charge under this section that the land or premises involved was owned, controlled, or in custody of a public agency"). It is therefore "well-established that a trespass can occur on public land." *State v. Collins*, 12th Dist. Butler No. CA98-01-007, 1998 Ohio App. LEXIS 4547, *3-*4 (Sept. 28, 1998), citing *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242 (1966). This would include, for instance, property belonging to a public library. *See, e.g., State v. Parks*, 5th Dist. Stark No. 2015CA00108, 2016-Ohio-1178; and *State v. Cahill*, 10th Dist. Franklin No. 90AP-404, 1990 Ohio App. LEXIS 5905 (Dec. 31, 1990).

*Mrs. Dean's Criminal Trespass Conviction*

**{¶ 49}** Based upon our review of the record, we find the state presented sufficient evidence to support Mrs. Dean's conviction for criminal trespass in violation of R.C. 2911.12(A)(2). Mrs. Dean, after being told by police not to return to the library following an incident where she became unruly with library staff for, among other things, not wearing a mask in violation of the library's mask policy then in effect, was seen on video footage taken from the library's security cameras entering onto the library's property, kneeling down in front of the library's curbside pick-up box, and walking down the sidewalk that separates the library building from the library's back parking lot. This video footage, which is part of the record on appeal, was played for the jury at trial and admitted as evidence at the conclusion of the state's case-in-chief. Therefore, while Mrs. Dean may dislike the jury's verdict, the jury's verdict finding her guilty of criminal trespass was nevertheless supported by sufficient evidence. The evidence presented by the state was, in fact, overwhelming proof of Mrs. Dean's guilt. Accordingly, finding the state presented more than enough evidence to support Mrs. Dean's criminal trespass conviction, the Deans' arguments related to Mrs. Dean's conviction for criminal trespass in violation of R.C. 2911.21(A)(2) lack merit.

*Mr. Dean's Criminal Trespass Conviction*

**{¶ 50}** The same is not true as it relates to Mr. Dean's criminal trespass conviction. That is to say, although the state presented sufficient evidence to support Mrs. Dean's conviction for criminal trespass in violation of R.C. 2911.21(A)(2), the state did not present sufficient evidence to support Mr. Dean's conviction. This is because Mr. Dean, unlike his wife, Mrs. Dean, was never warned by police not to return to the library after having previously being removed from the library's property due to his unruly behavior. *See State v. Kalman*, 4th Dist. Athens No. 16CA9, 2017-Ohio-7548, ¶ 44-46 (appellant's conviction for criminal trespass in violation of R.C. 2911.21[A][2] was supported by sufficient evidence where appellant entered a "clearly marked restricted area" on the grounds of a county courthouse to place a sticker on a directory affixed to the outside of the courthouse after appellant had twice been given notice that he was banned from the courthouse and the courthouse premises); *see also State v. Craft*, 4th Dist. Athens 97 CA 53, 1998 Ohio App. LEXIS 2269, *21-*22 (May 14, 1998) (appellant's conviction for criminal trespass in violation of R.C. 2911.21[A][2] was supported by sufficient evidence where appellant had previously been told by university police not to enter onto the university's property prior to him being found asleep on campus grounds).

**{¶ 51}** Despite what the dissent may argue, the fact that Mr. Dean was later charged and convicted of criminal mischief for placing a sticker on a traffic sign located on the library's property makes no difference to whether Mr. Dean could also be found guilty of committing a criminal trespass. Such holding complies with the Ohio Supreme Court's decision in *State v. Barksdale*, 2 Ohio St.3d 126 (1983). In *Barksdale*, the defendant was indicted on one count of breaking and entering in violation of R.C. 2911.13(B). Pursuant to that statute, "[n]o person shall trespass on the land or premises of another, with purpose to

commit a felony." "[T]he commission of a 'trespass' is a sine qua non of the offense of breaking and entering." (Emphasis deleted.) *Id.* at 127. The defendant's alleged trespass in *Barksdale* occurred when the defendant entered onto a car lot that was open to the public. The defendant, however, had not been given permission to enter the cars on the lot or to remove items from the cars parked on the lot. *Id.* The jury found the defendant guilty of breaking and entering and the defendant appealed.

{¶ 52} On appeal, the Second District Court of Appeals found the state had failed to prove an essential element of the crime of breaking and entering, i.e., a trespass. The Ohio Supreme Court affirmed the Second District's decision. In so holding, the Ohio Supreme Court examined the "privilege" that was extended to the defendant by the owner of the car lot, noting that:

> Neither party to the herein cause disputes the fact that the automobile dealer's tacit invitation extended the general public to visit the proprietor's lot to view the vehicles thereon was a grant of privilege. What is controverted, however, is whether a party who entered the lot with the purpose not of shopping for automobiles but of committing a felony, relinquished such privilege.

*Id.* at 128.

{¶ 53} The Ohio Supreme Court then went on to state, in pertinent part, the following:

> This court is convinced that were we to find that appellee, by virtue of his felonious intent, lost his right to enter the lot, a dramatic and completely unfounded change would be wrought in our system of justice. Literally thousands of criminal defendants, heretofore chargeable with only one offense, would suddenly find themselves answerable for a second, with no concomitant benefit accruing to society for whose protection the criminal statutes replete with their penalties exist. Without regard to the nature of their crimes, defendants would incur liability for breaking and entering whenever they stepped onto premises – whether stores, offices or even their own friends' and relatives' homes – with the intention of committing a felony. Though we certainly do not wish to reward criminals for exploiting the innocently extended invitations of merchants,

shopkeepers and gracious hosts, neither do we care to penalize criminals indiscriminately for acts for which the General Assembly clearly intended no punishment.

*Id.*

{¶ 54} The Ohio Supreme Court then set forth the following example:

The treatment that would be accorded a shoplifter, if appellant's construction of R.C. 2911.13(B) were to become the law, best exemplifies the potential oppressiveness of such an interpretation of the breaking and entering statute. Traditionally, theft and larceny statutes have been relied on to prosecute shoplifters. Under the regime which appellant envisions, however, a shoplifter would also be liable for breaking and entering, his felonious purpose – shoplifting – having vitiated his privilege to enter the store, a privilege enjoyed by the general public. The General Assembly clearly did not intend such a radical and unwarranted extension of the breaking and entering statute.

*Id.*

{¶ 55} In this case, given the evidence presented by the state, there can be little doubt that Mr. Dean entered onto the library's property to commit a crime by placing a sticker (or stickers) on the library's curbside pick-up box and traffic sign. However, pursuant to the Ohio Supreme Court's decision in *Barksdale*, the fact that Mr. Dean entered onto the library's property with the intent to commit a crime does not automatically render Mr. Dean's entry onto the property a criminal trespass. Rather, under the facts of this case, Mr. Dean's entry onto the library's property was akin to the Ohio Supreme Court's shoplifter example set forth above in *Barksdale*. *See also State v. Cooper*, 168 Ohio App.3d 378, 2006-Ohio-4004, ¶ 14 (2d Dist.) (appellant's "commission of a criminal offense once inside [a store appellant was privileged to enter because it was open to the public at the time appellant entered] cannot convert [appellant's] lawful entry into the store to an unlawful trespass. For example, a shoplifter who enters a store lawfully is a thief, not a burglar").

{¶ 56} This is all to say that, under these facts, while Mr. Dean's conduct while on

the library's property was criminally mischievous, something which Mr. Dean does not dispute in this appeal, Mr. Dean's conduct was not also criminally trespassory. *see, e.g., State v. Pillow*, 2d Dist. Greene No. 07CA095, 2008-Ohio-6046, ¶ 36 ("because Defendant's entry into the drive-thru was privileged, his commission of a theft offense once inside cannot convert his privileged entry into an unlawful trespass"). To hold otherwise would be in direct conflict with the Ohio Supreme Court's decision in *Barksdale* and function as an enhancement to every criminal offense occurring on property, either public or private, not otherwise owned by the defendant. *See, e.g., State v. Whitfield*, 8th Dist. Cuyahoga No. 71650, 1997 Ohio App. LEXIS 4648, *7 (Oct. 16, 1997) ("this court cannot accept the state's argument that appellant's otherwise lawful entry [into a public park] became unlawful upon his commission of a felony offense").

{¶ 57} In reaching this decision, we find it necessary to note, just like my respected colleague in his dissenting opinion set forth below, that the Ohio Supreme Court has twice narrowed its holding in *Barksdale*, first in *State v. Lyons*, 18 Ohio St.3d 204 (1985), and then again in *State v. Steffen*, 31 Ohio St.3d 111 (1987). However, upon review, the facts and circumstances in *Lyons* and *Steffen* that led the Ohio Supreme Court to narrow its holding in *Barksdale* are not present here. In *Lyons*, for instance, the facts established that no one was privileged to enter onto the subject property without tendering the necessary fee, thus rendering entrance onto the property conditioned upon proper payment. Whereas in *Steffen*, the Ohio Supreme Court determined that "the defendant's privilege to remain in the home as an invitee [after he was permitted into by the victim to demonstrate a cleaning product that he was selling door-to-door] terminated the moment he commenced his assault upon the victim." *State v. Russ*, 12th Dist. Clermont No. CA99-07-074, 2000 Ohio App. LEXIS 2759, *9-*10 (June 26, 2000), citing *Steffen* at 115. In so doing, the Ohio Supreme

Court "stressed the importance of the inviolability of private homes and distinguished between [crimes] committed against property and persons." *Id.*

{¶ 58} Unlike the factual scenarios presented in *Lyons* and *Steffen*, this case presents the very same situation that the Ohio Supreme Court expressed its concern in *Barksdale*, i.e., unnecessarily subjecting a defendant to unexpected second liability merely by stepping onto someone else's property with the intention of committing a crime thereon. As a result, when applying the Ohio Supreme Court's holding in *Barksdale* to the case at bar, we believe Mr. Dean should not have been found guilty of criminal trespass in this case. This holds true even though the library never gave anyone, including Mr. Dean, permission to enter onto its property to deface its curbside pick-up box or traffic sign. This is because, even when permission to enter the property is not explicitly given, this "does not vitiate the tacit invitation that has been extended to the public to enter the premises." *State v. Vukelich*, 9th Dist. Summit Nos. 12578 and 12628, 1987 Ohio App. LEXIS 6378, *6 (Apr. 8, 1987). Therefore, because this court is bound by and constrained to follow the decisions of the Ohio Supreme Court, *see State v. Rogers*, 12th Dist. Butler No. CA2019-11-194, 2020-Ohio-4102, ¶ 24, this court must apply the holding in *Barksdale* to the case at bar and reverse Mr. Dean's criminal trespass conviction.

{¶ 59} For these reasons, and finding merit to Mr. Dean's arguments raised herein challenging his conviction for criminal trespass in violation of R.C. 2911.21(A)(2), the Dean's fifth assignment of error is sustained as it relates to Mr. Dean's criminal trespass conviction only. In all other respects, the Deans' fifth assignment of error is overruled.

**Assignment of Error No. 6:**

{¶ 60} THE JURY ERRED TO THE PREJUDICE OF DEFENDANTS-APPELLANTS BY FINDING THEM GUILTY OF CHARGES AGAINST THE WEIGHT OF THE EVIDENCE.

**{¶ 61}** In their sixth assignment of error, the Deans argue their criminal trespass convictions were against the manifest weight of the evidence. Given our holding above finding the state presented insufficient evidence to support the jury's verdict finding Mr. Dean guilty of criminal trespass, any discussion of whether Mr. Dean's criminal trespass conviction was against the manifest weight of the evidence has now been rendered moot. We will therefore limit our analysis to Mrs. Dean's criminal trespass conviction only.

*Manifest Weight of the Evidence Standard*

**{¶ 62}** A manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. When determining whether a conviction is against the manifest weight of the evidence, an appellate court "must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34. But, even then, the determination of witness credibility is primarily for the trier of fact to decide at trial. *State v. Baker*, 12th Dist. Butler No. CA2019-08-146, 2020-Ohio-2882, ¶ 30, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This court "will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances when the evidence presented at trial weighs heavily in favor of acquittal." *State v. Kaufhold*, 12th Dist. Butler No. CA2019-09-148, 2020-Ohio-3835, ¶ 10, citing *State v. Blair*, 12th Dist. Butler No. CA2014-01-023, 2015-Ohio-818, ¶ 43.

*Mrs. Dean's Criminal Trespass Conviction*

{¶ 63} Based on our review of the record, we find Mrs. Deans' conviction for criminal trespass in violation of R.C. 2911.21(A)(2) was also not against the manifest weight of the evidence. As noted above, after being told by police not to return to the library following an incident where she became unruly with library staff for, among other things, not wearing a mask in violation of library mask policy then in effect, Mrs. Dean was seen on video footage taken from the library's security cameras entering onto the library's property, kneeling down in front of the library's curbside pick-up box, and walking down the sidewalk that separates the library building from the library's back parking lot. This video footage, which is part of the record on appeal, was played for the jury at trial and admitted as evidence at the conclusion of the state's case-in-chief. Mrs. Dean did not present any conflicting evidence for the jury to consider in her defense. Mrs. Dean, in fact, does not dispute that the video footage captured by the library's security cameras is of her and her husband, Mr. Dean. Therefore, while Mrs. Dean may dislike the jury's verdict, the jury's verdict finding her guilty of criminal trespass in violation of R.C. 2911.12(A)(2) was not against the manifest weight of the evidence. Accordingly, finding no merit to any of Mrs. Dean's arguments raised herein, the Deans' sixth assignment of error lacks merit and is overruled.

{¶ 64} Judgments in Case Nos. CRB2100235A, CRB2100235B. and CRB2100236A are affirmed and the judgment in Case No. CRB2100236B is reversed and vacated.

HENDRICKSON, J., concurs.

PIPER, P.J., concurs in part and dissents in part.


**PIPER, P.J., concurring in part and dissenting in part.**

{¶ 65} I concur with my respected colleagues in all the assignment of errors presented for review except I do not concur that Samuel Dean's conviction, as determined

by a jury, was insufficiently supported by evidence nor do I find his challenge to the weight of the evidence is moot. I therefore dissent in part because Samuel Dean was unquestionably guilty of criminal trespass and the record reveals it was sufficiently established. My friends in the majority find Samuel Dean possessed a privilege to be on the library property even though the evidence indisputably demonstrated his only purpose in being there was to commit a crime. Our majority holding finds the state can only prove the absence of privilege if the accused has received a warning beforehand not to be present. The totality of factual circumstances, not a warning, determine when an absence of privilege exists; circumstances do not always require a prior warning.

{¶ 66} Generally, an individual upon publicly controlled property has a privilege founded upon an implied grant of authority due to their status as a member of the public. Where the state does not allege the accused was engaged in any criminal activity while on public property there is a failure of proof to sustain a conviction for criminal trespass. *State v. Newell*, 93 Ohio App.3d 609, 611 (1st Dist. 1994). However, here, not only did the state establish Samuel Dean entered upon the property to commit criminal mischief, but even Samuel Dean does not challenge the evidence of his only intent being to commit criminal mischief. When the evidence overwhelmingly demonstrates that entering upon public property was solely to engage in criminal conduct, the jury rightly determined the circumstances negated any privilege to be there.

**PRIVILEGE IS DETERMINED BY CIRCUMSTANCES**

{¶ 67} Where no privilege exists, a defendant's presence constitutes trespass. *State v. Lyons,* 18 Ohio St.3d 204, 206 (1985) (referring to the criminal trespass statute, R.C.2911.21[A]). In *Lyons*, the Ohio Supreme Court explained that while the public could pay a fee to park in the parking lot thereby possessing a privilege to be there, the defendant

had "no intention to pay the fee," constituting a petty theft at best, denying him a privilege to be present in the lot. *Id.* The defendant had no intent to pay the lot parking fee as his only reason for being there was to commit a crime, even though the lot was implicitly open to the public. *Id.* at syllabus. With Lyons' sole intent in entering the property being criminal in nature and with no lawful purpose, the tacit invitation generally offered to the public was inapplicable to him. In other words, in circumstances where privilege to be present is non-existent, there is no requirement that the person must have received a prior warning. An individual knows his criminal intent to visit crime upon the property of another revokes any implied privilege to frequent the property. *Id.* Notably, it is not a defense to criminal trespass that the land or premise is available for public use or controlled or operated by a public entity. R.C. 2911.21(B).[5]

**{¶ 68}** Privilege is "an immunity, license, or right conferred by law, bestowed by express or implied grant, arising out of status, position, office, or relationship, or growing out of necessity." *State v. Hardcastle*, 12th Dist. Butler No. 2020-04-053, 2020-Ohio-5396, ¶ 13, quoting R.C. 2901.01(A)(12). A prior warning is not the only circumstance that can neutralize an implied privilege. If one is terminated from an office and returns at night and it is established the sole intent is to commit a crime, the terminated person doesn't need to be warned when terminated that their return will be unauthorized. Privilege does not assume unlawful criminal conduct is invited where no lawful intent, or acceptable purpose, for which the property is open to the public is to be served. "Privilege is the distinguishing characteristic between unlawful trespass and lawful presence * * *." *Id.* There is no privilege to enter or remain on land of another when the presence of the accused is only to fulfill the

---

5. The codification of criminal trespass was obviously derived from common law trespass in order to protect property—even public property. In *Lyons*, law enforcement observed a vehicle being broken into, which resulted in a trespass even though the parking lot was open to the public. *Id.* at 205.

intent to commit a criminal offense. The state bears the burden of proving to the jury a privilege is nonexistent and that a criminal intent is present. *State v. Schils*, 12th Dist. Clermont No. 2019-08-067, 2020-Ohio-2883, ¶ 13; *State v. Dailey*, 8th Dist. Cuyahoga No.89289, 2007-Ohio-6650, ¶ 38, citing *State v. Swartz*, 5th Dist. Morrow No. CA-608, 1983 Ohio App. LEXIS 5779, (Jan. 1, 1983) (expressly holding criminal intent as a necessary element of criminal trespass).

### CRIMINAL INTENTION NEGATES PRIVILEGE

**{¶ 69}** Where circumstantial evidence overwhelmingly demonstrates the only intent in entering the land or premises was to commit a criminal offense, an accused's claim of innocence by way of possessing privilege is disingenuous. Here, Samuel Dean presented no testimony, or evidence, of an innocent or lawful purpose.

**{¶ 70}** Privilege embraces the concept of implied permission, which necessarily can only arise from a totality of the circumstances. The law does not presume a public entity impliedly consents to being the victim of crime. Proof of privilege being absent does not always require proof of a specific denial of permission, and to insinuate such is misguided. "No requirement exists that 'no trespassing' signs be posted on property, or that the person in control or possession of property notify everyone in the world that they are not welcome to come onto the property." *State v. Janson*, 1st Dist. Hamilton No. C-080906, 2009-Ohio-3256, ¶ 16. In rare and specific circumstances, as present here, a jury could reasonably conclude that one who enters upon public property to commit a crime does so without privilege; a jury's verdict for both criminal trespass and criminal mischief can survive a challenge to both the sufficiency and the weight of the evidence. *State v. Callihan*, 7th Dist. Noble No. 210485, 2022-Ohio-2082, ¶ 25. Upon appellate review when considering the sufficiency of the evidence, it must be viewed in the light most favorable to the state. *State*

*v. Lilly,* 87 Ohio St.3d 97, 103 (1999) (where it was reasonable for the jury to find the defendant was without permission to be present despite his claims to the contrary).

{¶ 71} Even on property open to the public the privilege to enter evades the individual who enters with only criminal intent. The Tenth District Court of Appeals determined that the jury was free to infer the defendant's privilege to enter a school had been revoked, and his presence in the school constituted a trespass. While in the parking lot immediately beforehand, the defendant shot a firearm in the direction of his estranged girlfriend and entered the school to find her with malicious intent; his entrance in the school was a trespass. *State v. Thompson*, 10th Dist. Franklin No. 97APA04-489, 1997 Ohio App. LEXIS 5134, at *12 (Nov. 10, 1997) (explaining that even though a public facility "permission to be any place can be terminated with the commission of a crime").

{¶ 72} Even assuming an initial lawful entry, one whose conduct comprises a criminal offense is aware that their initial privilege has been terminated and that to remain on the land or premises constitutes a trespass without privilege. *State v. Steffen*, 31 Ohio St.3d 111, 115 (1987); *State v. Seymore*, 12th Dist. Butler No. CA2021-09-113, 2022-Ohio-2180, ¶ 23 (the parties were arguing about an alleged infidelity and while appellant was initially permitted to enter the premises, his privilege was revoked the moment he committed a crime upon his former girlfriend). Other circumstances have resulted in the privilege forfeited, rendering the defendant a trespasser, the very moment an offense was perpetrated upon a victim. *State v. Wisecup*, 12th Dist. Clermont No. CA2004-02-014, 2004-Ohio-5652, ¶ 10. Similarly, a defendant's effort to steal from a secretary's office in the church rectory terminated his privilege to be present in the rectory. *State v. Zylko*, 8th Dist. Cuyahoga No. 89949, 2008-Ohio-3032, ¶ 33. Importantly, *Zylko* suggests there is no societal interest or logical reason to distinguish between a felony of violence and a

misdemeanor crime; regardless of the degree of the offense, entrance upon land of another with criminal intent, public or not, is uninvited, unauthorized, and unwelcomed, and is to be provided no sanctuary by an unwritten construct of an implied privilege. [6]

**{¶ 73}** To find Samuel Dean guilty of criminal trespass upon public property, the jury was required to unanimously find from the factual circumstances that no privilege existed. Circumstantial evidence can negate the existence of an implied privilege. The law surely finds it unacceptable that one who, by design, enters public property with the sole intent of damaging, defacing, or destroying that property enters the land with an implied privilege. Here, the jury found the state met its burden of proof in establishing Dean committed criminal trespass.

**{¶ 74}** Samuel Dean had no license or right, nor any status giving rise to an implied grant, to enter upon library property so he could commit the offense of criminal mischief. He went to the library on Sunday when it was closed with full awareness his sole purpose was to commit the crime of criminal mischief. With no evidence of a reasonable inference he was there for a legitimate purpose, his intended criminal mischief made his entrance upon the property an unlawful trespass. Samuel Dean's criminal interest was purely his own and he possessed no tacit invitation to facilitate inappropriate, or unlawful, business. Accordingly, the jury followed the instructions of law and determined him guilty of criminal

---

6. The allied-offense statute, R.C. 2941.25, concerns the merger of convictions arising from the same conduct and animus. Offenses coincidentally committed in public would be merged into a more serious offense. The majority expresses concern that Samuel Dean would be subject to "unexpected second liability," yet the jury found Dean went to the property and trespassed with criminal intent thus his liability cannot have been *unexpected*. Furthermore, *second liability* would be negated with the use of merger. While the convictions for criminal trespass and criminal mischief herein may have merged for sentencing purposes, such was not raised before the trial court nor argued on appeal. *See Seymore*, 2022-Ohio-2180 at ¶ 25 (where privilege evaded the defendant due to his criminal conduct, yet the offenses were allied offenses of similar import, required to be merged). Separate offenses however may be eligible to be expunged. R.C.2953.31(A)(1)(b).

trespass as well as criminal mischief.[7]

### *BARKSDALE*

**{¶ 75}** The majority's decision relies heavily on its conformity with an Ohio Supreme court case, *State v. Barksdale*, 2 Ohio St.3d 126 (1983), which dealt with a burglary charge. The court looked to other state courts because "the instant cause asks us to traverse * * * virtually unexplored legal terrain." *Id.* at 128. It concurred with sister courts interpreting the laws of their state from that time period because the court found itself with a case of first impression. *Id.*

**{¶ 76}** In *Barksdale* the court's concern seemed to involve the extended invitations of merchants, shopkeepers, and gracious host to business invitees or licensees. *Id.* There was not even remote discussion of the state's need to prove the absence of privilege by demonstrating a previous warning to the would-be offender intending a crime upon public property when entering. The Supreme Court subsequent to *Barksdale* decided *Lyons,* which is much closer to our facts sub judice and therefore offers better guidance.

**{¶ 77}** The Court in *Barksdale* became concerned with a hypothetical it created: a shoplifter could be simultaneously charged for a theft offense and also charged with criminal trespass. *Id.* While there was no acknowledgement the two offenses, if charged, would be merged, the court suggested the General Assembly's legislative intent supported the court's outcome of nullifying the criminal trespass. No explanation for how the court arrived at the General Assembly's intent was given. There was, however, reference to R.C.2901.04(A) reminding the reader that *defining* penalties and *offenses* shall be strictly construed against the state yet no explanation as to how the circumstances did or did not create a privilege.

---

7. Neither Samuel nor Julie challenge the sufficiency of the evidence or weight of the evidence pertaining to their convictions for criminal mischief.

*Id.* at 129. The present issue does not involve defining an offense; our issue today is what factual circumstances are necessary to determine the absence of privilege.[8] And despite the majority's insistence, *Barksdale* is not the "same situation" we have here.

**{¶ 78}** Reliance upon a case dispensing a hypothetical is not strong support. In the end *Barksdale* provides little illumination to the facts at hand and any light it does shed is opaque. Interestingly, neither Samuel Dean's brief, nor argument, employed reference or reliance upon *Barksdale*. The arguments made, and decided in *Barksdale*, were different than those before us today.[9]

**CONCLUSION**

**{¶ 79}** The majority decision decides the state did not prove, as a matter of law, that Samuel Dean committed the act of criminal trespass despite the factual circumstances revealing that he had no implied privilege to enter upon library property to fulfill his mission of criminal intent. My concern is that the evidence was not viewed by the majority in the light most favorable to the state as the law requires us to do. Instead, the majority nullifies Dean's conviction finding that if in a public place an accused must receive a warning beforehand. This finding applies, even if it is proved beyond a reasonable doubt the trespass is one with criminal intent. I must respectfully disagree.

**{¶ 80}** Certainly, under normal circumstances a member of the public possesses an implied grant to be on public property, giving them the privilege to be there. However, my colleagues determine that in a unique factual situation as we have here, the implied privilege

---

8. Additionally, the justices dissenting in *Barksdale* suggest the majority too narrowly interprets the statutes it employs. *Id.* at 130 (Holmes, J. dissenting opinion).

9. The hypothetical in *Barksdale* appears to influence the majority's concern for liability regarding a second charge. However, "privilege" was not meant to nullify a second charge and the imposed requirement of a "warning" should not be used to nullify a second charge. A second penalty is negated with the General Assembly's creation of merger. R.C 2941.25.

can only be negated by telling the accused he cannot come onto the property to commit his intended crime. While I respect my colleagues' concerns for situations other than what we have here, and for punishment attached to a second offense arising from the same animus, I find their interpretation of the law unworkable in circumstances where the designed entrance upon public land is only intended to fulfill criminal conduct. When the trespass is with demonstrative criminal intent, if proved beyond a reasonable doubt, as it was here, the trespass must never be considered privileged.

{¶ 81} While I agree with my colleagues in overruling the first four assignments of error, I would also overrule both the fifth and sixth assignments of error and affirm Samuel Dean's conviction for criminal trespass as the evidence was both sufficient and proved by the weight of evidence beyond a reasonable doubt.